**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| United States of America, | Civil No. 07-3229 (DSD / SRN) |
| **Plaintiff,** | |
| v. | **REPORT & RECOMMENDATION** |
| $186,907.00 In U.S. Currency, One 2006 Dodge Ram Pickup, and One 2007 Maurer 16 Foot Full Tilt Dual Axel Flatbed Trailer, | |
| **Defendants.** | |

James S. Alexander, Assistant U.S. Attorney, 600 US. Courthouse, 300 South Fourth Street, Minneapolis, MN, 55415, for Plaintiff.

William D. Brandt, 1820 Commercial Street SE, Salem, OR 97302; Lynne Torgerson, 80 South Eighth Street, Suite 900, Minneapolis, MN, 55402; & Paul M. Ferder, Ferder Casebeer French & Thompson, P.O. Box. 843, Salem, OR 97308-0843, for Claimant.

SUSAN RICHARD NELSON, United States Magistrate Judge

This matter comes before the undersigned United States Magistrate Judge on Claimant's Motion To Suppress Evidence and Statements (Doc. No. 28). The matter has been referred to the undersigned for a Report and Recommendation pursuant to 28 U.S.C. § 636 and District of Minnesota Local Rule 72.1(a). For the reasons stated below, the Court recommends that the motion be denied.

**I.    FACTUAL AND PROCEDURAL HISTORY**

On February 14, 2007, Minnesota State Trooper Gary Nordseth was patrolling on I-90 when he observed the tires of a truck driven by Claimant Cipriano Larios Garcia cross the fog

line.[1]  After observing the truck's tires cross the line several more times, the trooper stopped the vehicle.  As he approached the vehicle, Trooper Nordseth immediately noticed that the trailer looked new, and that a toolbox in the bed of the truck was attached by what appeared to be non-factory welds.  Upon arriving at the driver's side window, he further detected a strong odor of air freshener, and observed multiple air fresheners in the passenger compartment, a high odometer reading on what appeared to be a late-model vehicle, and only a single key on the ignition key ring, a practice often used by drivers of vehicles transporting drugs as it facilitates dropping off the vehicle with the ignition key left in the vehicle.

After explaining the reason for stopping the vehicle, the trooper asked the driver to accompany him back to the squad, where he inquired whether the driver was diabetic, intoxicated, tired, or on medication, all of which Claimant denied.  While performing standard background checks, Trooper Nordseth asked Claimant several routine questions.  Claimant explained that he was a mechanic by trade and that he had just helped a cousin transport a car from Fargo to Minneapolis on the trailer he was hauling.  Trooper Nordseth's earlier suspicions were further aroused based on Claimant's hesitation and imprecision in identifying what type of car he had hauled and on the fact that the trailer appeared new and lacked any tire tracks on it.  Accordingly, the trooper requested a canine unit.

Nevertheless, having finished the inquiries normally associated with a traffic stop, the trooper then returned Claimant's license and released him with just a warning.  As Claimant was exiting the squad to return to his truck, the trooper asked Claimant if he would answer some questions.  After Claimant agreed, the trooper inquired whether he was carrying any illegal drugs

---

[1] Trooper Nordseth testified at the May 30, 2008, hearing in this matter, as did Murray County Sheriff's Deputy Brian R. Gass.  Claimant did not testify.

or large amounts of cash, all of which Claimant denied. The trooper then asked for Claimant's permission to search both his person and the vehicle. Claimant consented.

The trooper first located cash in excess of $1800 in Claimant's pants pocket before proceeding to search the passenger compartment, where he located more air fresheners, Visine eye drops, Bondo, a putty knife and black electrical tape. As the trooper began to search the bed of the truck and the toolbox within it, the canine unit arrived. The trooper explained the situation to the canine officer, Deputy Brian R. Gass. Deputy Gass and his dog Bailey conducted a sniff search of the perimeter of the vehicle. While near the driver's door Bailey alerted to the presence of controlled substances but without being able to identify the precise source of the odor. Accordingly, the officer conducted a canine search inside the bed of the truck. Bailey immediately indicated the presence of controlled substances in or under the toolbox. By this time, another state trooper had arrived on the scene too.

Trooper Nordseth thus informed Claimant that while he was free to go, the vehicle would be taken into custody and searched more thoroughly at a repair shop in a nearby town. Claimant chose to accompany the vehicle to the repair shop. The subsequent search revealed $185,020 in cash hidden inside a fuel tank compartment underneath the toolbox. Tests showed the currency to be contaminated with cocaine.

Claimant now moves to suppress all of the evidence–the vehicle itself and the cash found on his person as well as that found in the truck–as having been obtained in violation of his Fourth Amendment rights. Following the hearing in this matter, however, District Court Judge Doty issued an Order addressing Claimant's standing. The Government had moved for default judgment against all unknown defendants who had not filed a claim to the property, and for partial summary judgment with respect to the $185,020 found inside the fuel tank. The District

Court ruled that Claimant lacked standing to pursue his claim to the cash found inside the fuel tank because Claimant "consistently maintained that he had no knowledge of the $185,020 until the officers searched his vehicle" and because the mere presence of the cash in the vehicle did not amount to a sufficient possessory interest to establish his standing.  (Doc. No. 56, at 5-6.)  The Court also rejected his assertion of a possessory interest as a bailee.  (Id. at 6.)

Accordingly, for purposes of the present suppression motion, because Claimant has standing to assert ownership only with respect to the cash found in his pocket and to the truck, he cannot challenge the seizure of the $185,020 as a violation of the Fourth Amendment so as to preclude the government from using such evidence to establish the requisite probable cause to support forfeiture.

## II.   DISCUSSION

Claimant generally argues that his rights were violated "when Minnesota State Police stopped his vehicle upon a purported traffic infraction and then expanded the scope of the stop by inquiring into matters unrelated to the basis for the stop."  (Mem. at 4.)  Claimant first contends that the officer lacked the requisite basis to initiate a traffic stop and then argues that "the scope of a valid traffic stop is limited and is to be directed to the immediate circumstances that aroused the suspicion of the officer."  (Id.)

But it is beyond dispute that Trooper Nordseth, having personally observed the vehicle cross the fog line several times, had a proper basis to initiate the traffic stop.  E.g. United States v. Olivera-Mendez, 484 F.23d 505, 509 (8th Cir. 2007) ("[I]t is well-established that a police officer who observes a traffic violation has probable cause to stop the vehicle and its driver."); United States v. Cummins, 920 F.2d 498, 500 (8th Cir. 1990) ("When an officer observes a traffic offense–however minor–he has probable cause to stop the driver of the vehicle."); see

Pennsylvania v. Mimms, 434 U.S. 106, 109 (1977) (stating that "driving an automobile with expired license tags in violation" of state law presents "no question about the propriety of the initial" stop).[2]

Claimant also asserts that "[i]n this case, what is unusual is that the officer required Claimant to get out of the vehicle." (Supp. Mem. at 4.) But where, as here, the initial stop is valid, the officer may lawfully direct the driver (and any passengers) to get out of their vehicle. Maryland v. Wilson, 519 U.S. 408, 410 (1997); Pennsylvania v. Mimms, 434 U.S. 106, 111 & n.6 (1977). Claimant's argument that he was improperly seized is further directed, however, at the fact that the trooper asked Claimant to sit in his squad car. (Mem. at 6.) Once an officer makes a valid traffic stop, however, the officer may direct an occupant of the vehicle to stay in the officer's squad car pending the investigation of the occupant's license and criminal record. E.g. United States v. Bloomfield, 40 F.3d 910, 915 (8th Cir. 1994). Whatever additional detention such a procedure imposes on a driver beyond that inherent in being stopped and

---

[2] Claimant argues that "the authorities were acting on some information which has never been disclosed but which was related to the prior use of the vehicle by Roberto to whom [Claimant] lent his vehicle," such that Claimant "was already a suspect and that he was going to be stopped and searched regardless of whether or not there was any reasonable basis to do so." (Supp. Mem. at 2.) Claimant supports this theory based on the fact that (1) Trooper Nordseth's written report contains an inaccuracy that is not a simple mistake, (2) Trooper Nordseth could not "identify the statutory violation for which he allegedly stopped Claimant." (Id. at 2-3.) But nothing in the record supports the naked contention that the authorities operated under a pre-existing plan to stop this particular vehicle. Moreover, "[i]f the officer is legally authorized to stop the driver, any additional 'underlying intent or motivation' does not invalidate the stop." United States v. Bloomfield, 40 F.3d 910, 915 (8th Cir. 1994). Repeatedly crossing the fog line is an obvious traffic infraction, Minn. Stat. § 169.18, subd. 7(a) (requiring that vehicle "shall be driven as nearly as practicable entirely within a single lane"), and an officer's inability to identify the particular statute prohibiting such behavior does not undermine the validity of the stop. Nor does the argument that the trooper's testimony that he stopped Claimant for "not maintaining his lane" raise any genuine inconsistency with the trooper's report noting that the stop was due to Claimant "crossing the fog line," which is simply one form of not maintaining one's lane.

5

removed from the vehicle is *de minimus*, particularly insofar as the length of the detention here does not appear to have been greater than that necessary for a routine traffic infraction. In short, all aspects of the "seizure" of Claimant here–the initial stop of the vehicle, removing him from his vehicle, and placing him in the squad–were entirely valid.

Claimant next argues that there was no basis to expand the nature and extent of the stop beyond the scope of a routine traffic stop. (Mem. at 8.) He contends that the stop was impermissibly extended because "the only time needed was to ascertain whether Claimant was operating a vehicle under the influence or was otherwise impaired so as to be unsafe"–a period he contends "should not have exceeded five minutes." (Supp. Mem. at 7; id. at 4 ("This stop should have lasted no more than the 2 or 3 minutes it would have taken any seasoned police officer to ascertain Claimant was not driving impaired.").)[3]

But it does not appear that the trooper did in fact expand the scope of the "seizure" beyond that permissible in conducting a routine traffic stop. E.g. United States v. Olivera-Mendez, 484 F.23d 505, 509 (8th Cir. 2007) (noting that valid traffic stop permits officer to check the "driver's license, vehicle registration, and criminal history" and to "ask the occupants routine questions"); United States v. $404,905.00 in U.S. Currency, 182 F.3d 643, 647 (8th Cir. 1999) ("[H]aving made a valid traffic stop, the police officer may detain the offending motorist while the officer completes a number of routine but somewhat time-consuming tasks related to the traffic violation, such as computerized checks of the vehicle's registration and the driver's

---

[3] Claimant fails to establish precisely how long the detention lasted and to what extent it might have extended beyond that necessary to conduct permissible routine inquiries. Moreover, any such argument, whatever it might be based on, must be confined to the period before Claimant consented to searches of his person and the truck. See United States v. White, 42 F.3d 457, 460 (8th Cir. 1994) (concluding that "scope of the initial traffic stop" was reasonable where officer returned driver's license and released him upon finishing routine inquiries, all of which occurred before officer obtained consent for search of truck).

license and criminal history, and the writing up of a citation."). After finishing these routine tasks, the trooper returned Claimant's license and other documents and released him with a warning. Thus, the record does not disclose that the trooper exceeded the parameters of a permissible stop that was initiated based on a traffic violation.

Moreover, even if the permissible bounds of such a stop were somewhat exceeded here, there would appear to be a sufficient basis for such a minimal extension. Claimant's argument ignores the fact that almost immediately upon stopping Claimant for a traffic violation, Trooper Nordseth observed indications of suspicious activity that distinguish this situation from those where an officer has no basis to detain a motorist beyond the fact of a simple traffic infraction.[4] Trooper Nordseth immediately noticed the non-factory welds on the toolbox. He also observed multiple air fresheners in the passenger compartment, high mileage for a new vehicle and a single key in the ignition. While any of these in isolation might not support a reasonable suspicion sufficient to investigate further, here the aggregate of such indicators was enough to justify whatever brief additional period of detention then purportedly occurred. Cf. United States v. Olivera-Mendez, 484 F.3d 505, 513 (8th Cir. 2007) (stating that discovery of air freshener and Bondo "justified [officer's] continued search for contraband and sharpened the focus on a hidden compartment containing drugs").[5]

---

[4] Claimant relies on Brendlin v. California, ___ U.S. ___, 127 S. Ct. 2400 (2007), to support his argument that the aggregate of several indicators such as "lack of registration or other appropriate vehicle paperwork, . . . driver's lack of eye contact, nervous behavior, [and] existence of . . . food items were not facts which supported reasonable suspicion." (Supp. Mem. at 5.) But in Brendlin, the Supreme Court addressed only the issue of whether a vehicular passenger was "seized," so as to be able to challenge the government's action, when the vehicle is stopped. 127 S. Ct. at 2403. The Court did not address what aggregate of indicators was sufficient to constitute probable cause or a reasonable suspicion.

[5] Claimant contends that each of the three cases cited by the government in support of its argument regarding the length of the stop is "easily distinguished." (Supp. Mem. at 6.) But any

After Claimant was seated in the trooper's squad car while the trooper conducted a routine traffic investigation, the trooper noted that even though Claimant had identified himself as a mechanic who had helped his cousin transport a car, Claimant hesitated in identifying his cousin's name and what type of car he had just transported. The trooper also noticed that the trailer appeared to be new and there were no wheel tracks on the trailer. In fact, his suspicions prompted him to then request a canine unit. "At this point, [the trooper] had justification for a greater intrusion unrelated to the traffic offense." United States v. Cummins, 920 F.2d 498, 502 (8th Cir. 1990).

Even so, the trooper, having completed his routine investigation based on the traffic infraction, returned Claimant's license and released him. Only then, as Claimant was exiting the squad, did the trooper inquire whether Claimant would answer some additional questions. Claimant agreed to do so. Then–and most importantly–Claimant also freely consented to Trooper Nordseth's request for permission to search Claimant's person and his vehicle.[6]

---

such argument misses the mark because any individual case presents a unique set of facts that must be judged individually. That some of the facts in each of those cases differ from those at issue here hardly precludes the conclusion that the detention here was valid based on an assessment of the totality of the particular circumstances at issue here. In addition, the length of detention in those cases was clearly in excess of that necessary for processing a routine traffic infraction. United States v. Maltais, 403 F.3d 550, 556 (8th Cir. 2005) (addressing detention "for almost three hours before arrest, including at least 90 minutes in [officer's] patrol car"); United States v. White, 42 F.3d 457, 460 (8th Cir. 1994) ("The wait of about one hour and twenty minutes pending arrival of the drug dog was a reasonable period to detain the truck."); United States v. Bloomfield, 40 F.3d 910, 917 ("The one-hour period between the time [the officer] pulled [the driver] over and the time [he] arrested [the driver] was not an unreasonable period to wait for a drug dog to verify [the officer's] suspicion."). And here, Claimant was not detained beyond the normal period for a traffic stop in order to await the arrival of the canine unit. Rather, the canine unit was requested while Trooper Nordseth conducted the routine inquiries, after which Claimant was released but then promptly consented to the searches. The canine unit arrived while those searches were being conducted.

[6] Claimant further argues that he felt compelled to consent because "there were two additional officers present when the alleged consent was given." (Supp. Mem. at 5.) But

Claimant contends that any consent he provided was not voluntary because "his first language is Spanish" and he "was unaware that he had a right to refuse consent to the search or to leave and he was not advised that he could do so." (Mem. at 7.) But Trooper Nordseth testified that Claimant appeared to speak and understand English sufficiently well as they conversed at some length without any apparent difficulty.[7] Claimant also argues that his purported consent "could hardly be considered to be voluntary under the circumstances" because the officer "took Claimant into custody" and "never advised Claimant he was free to go." (Supp. Mem. at 4-5.) But the trooper did not ask for permission to search until after he had released Claimant upon finishing his initial routine inquiries.

Finally, Claimant contends that "[t]he use of the drug dog Bailey constituted a search." (Supp. Mem. at 6.) Putting aside the fact that Claimant had consented to a search of both his person and his vehicle, the U.S. Supreme Court has ruled that a canine sniff search of a vehicle's perimeter is not a "search" for purposes of the Fourth Amendment. Illinois v. Caballes, 543 U.S. 405, 408 (2005) ("[C]onducting a dog sniff would not change the character of a traffic stop that is lawful at its inception and otherwise executed in a reasonable manner, unless the dog sniff itself infringed [the driver's] constitutionally protected interest in privacy. Our cases hold that it did not."). As the Court explained, "the use of a well-trained narcotics-detection dog–one that 'does not expose non-contraband items that otherwise would remain hidden from public

---

Trooper Nordseth testified that he asked Claimant for permission to conduct the searches before the other trooper or the canine unit appeared on the scene.

[7] Claimant filed an Affidavit stating that while he understands and speaks "some English," "for the most part" he needs "the assistance of a Spanish speaking person . . . to fully understand what people say" in English, particularly if he does not know them. (Doc. No. 22.) But he did not testify at the hearing and his assertion of not being able to "fully understand" English without an interpreter was directly countered by Trooper Nordseth's testimony that Claimant adequately conversed with him in English.

9

view'–during a lawful traffic stop, generally does not implicate legitimate privacy interests." Id. at 409.  Where "the dog sniff was performed on the exterior of respondent's car while he was lawfully seized for a traffic violation," any intrusion on his "privacy expectations does not rise to the level of a constitutionally cognizable infringement." Id.

Thus, there is no basis to object to the initial search of the vehicle's perimeter.  And here, that initial search resulted in an "alert" to controlled substances, a detection of odor but without the ability to pinpoint its source.  A subsequent search of the bed of the truck resulted in an "indication" of controlled substances, a detection of such substances at a particular location.  Claimant contends that the first alert does not justify entering the bed of the truck to conduct further searches.  But once the canine "alerted on the exterior of [the] trailer," the officer had probable cause to search the trailer's interior without a warrant." United States v. $404,905.00 in U.S. Currency, 182 F.3d 643, 647 (8th Cir. 1999).  Accord United States v. Olivera-Mendez, 484 F.23d 505, 512 (8th Cir. 2007) (stating that dog's "alert established probable cause to believe the vehicle contained hidden contraband" and such probable cause "justifies the search of every part of the vehicle and its contents that may conceal the object of the search").  And in any event, any such issue is moot here because Claimant had consented to a search of the truck.

### III.    RECOMMENDATION

Based on the foregoing, and all the files, records and proceedings herein, IT IS HEREBY RECOMMENDED that:

1.    Claimant's motion to suppress (Doc. No. 28) be DENIED.

Dated:  July 14, 2008

   s/ Susan Richard Nelson

SUSAN RICHARD NELSON
United States Magistrate Judge


Under D. Minn. LR 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court and serving all parties by July 29, 2008, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections.  Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.  This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable to the Court of Appeals.